Good morning. My name is Mark Ellis and I represent the appellant. And with me is... Can you speak closer into the microphone? I'm having a little trouble hearing you. There you go. Better? There you go. Thank you. And with me is Grant Winter and he helped on the briefs. So there are really two overarching issues here. And by the way, may I have two minutes for a couple of things? But there are really two overarching issues here, Your Honors. The first one is the statute of limitations. And then the second is what I would call the Twombly-Iqbal issue in terms of whether or not, in terms of the pleading of the First Amendment complaint, we pled sufficient to get past the plausibility standard. On the first issue, the statute of limitations, serendipitously two weeks ago, as the Court knows, the California Supreme Court came down with its decision and I'm sure I'm going to butcher this name. I believe it's ARYEH versus Cannon Business Solutions. And in that case, the California Supreme Court clarified what had... Just before you start, I just want to make sure on jurisdiction I have a question. It looks like you still have an accounting claim from the district, you know, that might still remain. Is that correct? No, Your Honor. The accounting claim was dismissed pursuant to Rule 41 with prejudice when, in the spring of 2011, I advised Judge England that we wanted to stand on the pleadings that we did have. Because he had eliminated the four substantive causes of action, and so only the accounting claim was left, and so we requested that the entire case be dismissed, because we didn't really, for two different reasons. Accounting claim is a remedy for the... Precisely. Exactly. And Judge England, in fact, I think this is in the first appendix in his ruling, says, look, we don't want the causes of action to be split and to brought piecemeal, and neither did I. I mean, did not want to go forward with a wounded duck accounting claim when I didn't have any of the substantive claims under the UCL. Does that make sense, Your Honor? It's gone. The whole case is in front of you at this point in time. The only, I think, trouble that that really makes is there's perhaps a split standard of review. You know, Rule 41 is an abuse of discretion standard. The 12b-6 claims are all going to be de novo. So I think that's the, I think that's kind of the only hook that we have here. So if you lost the appeals, you would lose your accounting claim and you know that. Yeah, correct. Okay. Thank you. It's either up or down is how I see it. All right. Let's talk about the REI case, because it seems like continuous accrual requires a new wrongful act during the period. And in REI, it was making copies on the machines. And I'm trying to figure out, you know, what wrongful act is IHOP doing? It's billing us every week. And I really think that that's really what REI stands for. REI states, and as a former law, appellate law clerk, I know that the judges hate to have to be read from opinions. But in the, what the California Supreme Court says here, and again I don't have an official site. I've still got the Westlaw site. I'm not sure official site is out yet. But what the court there says is that in terms of the continuous accrual, there's a new damage or injury every time it's billed. And I think that this case really fits squarely into that in terms of the continuous accrual. So the only thing, and I understand, I guess, why you're making that argument, but wouldn't that eliminate the statute of limitations in every contract that has periodic payments? Well, in fact, in every contract that has periodic payments, California law permits you to bring a claim every time a payment is missed. What, that typically doesn't happen, Your Honor, because under most commercial contracts there's an acceleration clause that permits you to treat a breach as a breach into the future and lets you bring a claim immediately. But in fact, in this case, the California Supreme Court talks about numerous contract cases in which that's exactly what can happen. And so ultimately, what the court, here's the dichotomy between what Judge Englund said and what the California Supreme Court said. Because Judge Englund in his order says, look, what this, if I said that the statute of limitations started later, what that would permit you to do is to take the benefit of the contract, and then when later on you didn't like it, you could then, you know, claim that there was a breach or an unfair business practice. But the California Supreme Court looked at it a completely different way. The California Supreme Court said, you know, we have to, the statute of limitations, no matter what you're talking about, has an accrual only when all the elements are complete. And what the court said in terms of the continuous accrual is that the element, that is, the damage element, is not complete until you have a payment. And so here the court says, because the complaint alleges excess charges within the four years preceding suit, it is not completely barred by the statute of limitations. And in our case, it is undisputed that we allege that the $740 was being paid every week past the filing of the lawsuit. But that was all contained in the contract, the, your client signed. It was. And so, and I want to address that, because when I talk with people about this case and I tell them that, you know, essentially, I call this, by the way, the something for nothing case, that is, you're paying something, although you're getting nothing. And the contract says that. But, Your Honor, here's the thing. The UCL says even if you've got a contract, you can still have an unfair business practice. I mean, everyone understands that. And that's what we have here. I mean, if every contract, because there's a contract, is going to be enforceable because it's a contract, we would never have things like illusory contracts. Well, I don't see how that helps you with the statute of limitations. Well, I think in this case, again, the damages continued on individual payments up through and past the statute, up through when the lawsuit was filed. And here is what the Court says in its penultimate paragraph of the decision. In sum, at the demur stage, of course, the equivalent of 12b-6, REA is the master of his complaint and we must accept his allegations at face value. He has alleged a recurring unfair act, the inclusion in monthly bills of charges for copies Cannon itself made. I think it's honestly virtually indistinguishable from this case. But Cannon is doing something, isn't it? Well, so is, yeah, it's charging money. And, okay, let me approach it a different way. If we were talking about, for example, the tort of malpractice, by analogy, you could have a duty and you could have a breach. But there would be no fully formed tort unless you had causation and damages. That's really what the Supreme Court is getting at here. And they say, and this is their interpretation of their procedural device, of course, under ERIE, they're saying that in these cases you have to have an act and you have to have a consequence. And it's only when you have the last thing that under accrual the statute starts. So I think that ARIA is dispositive here. I think that under ERIE Railroad v. Tompkins, and I hate to say this to appellate panel of Federal judges, but I think that it has to be accepted by this Court, even if the Court doesn't like it. And I just don't think it's continuous accrual. I think there's also in this case, unlike the ARIA case, I think there's a basis for applying the continuing violation doctrine, because the continuing violation doctrine as enunciated by the California Supreme Court says that we apply that and then get larger as time goes on. And what the Court says, and this is at asterisk, page asterisk 7, the Court says, those injured in such a fashion should not be handicapped by the inability to identify with certainty when harm has occurred or has arisen. The Court goes on to state, it is unwise to impose a limitations regime that would require parties to run to court in response to every slight without first attempting to resolve matters through extrajudicial means out of fear that delay would result in time barred action. I'm going to just have one more comment on this and then I'll move on. Yes, Your Honor. Well, I just on the, I want to make sure I understand how the lease violates the UCL, because, I mean, it seems like you think that the fact, you know, the contract is unfair, the something for nothing, right? Is that? I do. I think it's unfair. I think it's deceptive. I don't know if that's enough. I mean, can you link the claim to a specific constitutional statutory or regulatory provision? I think don't we have to do that under the Gregory v. Albertson? I don't think. Well, it has to be a legislative or it has to be a, I don't think it has to be congressional. I don't think it has to be Federal. The UCL stands on its own. You can, it goes one of two ways. You can either borrow a violation from other law, but the law is clear that it in and of itself makes wrongful practices. I think the case is what the courts say, whatever the scheme that can be devised by man which completely, you know, changes. So in this case, I think it's not only unfair under California law, California contract law, but I think it's also deceptive. I have another question before your two minutes. If you could explain to me why the new lease caused, why the new lease caused the increase in property tax rather than the sale causing the increase. Well, I think that the sale did cause it. I mean, just to be, you know, perfectly frank with you. I don't think, I don't think there was anything in the mechanics of the lease itself that caused it. The problem here is, and I've seen this in the other brief, the problem here is not what the lease itself says. The problem is that you have in the franchise agreement and in the lease, in this three-tiered system, there is a term that says we will not materially increase, you know, your financial obligations. It doesn't say that exactly, but it works to that effect. You understand what I'm saying? And so, and that's what happened here. So the causation analysis in terms of, I think, what your question gets to, has perplexed me through this case. It really has. Because I don't think at this stage in terms of the causation analysis to particular exactly why it happened, all we have, all we know right now is that there was a term that my client relied on in an agreement, and that term has apparently been violated. We've attempted to find out why. We can't find out exactly how this happened. That's also pled in the complaint. And so I think it's kind of unfair at the pleading stage for the Court and Judge Englund, who I think is a very fine judge, but he really put me in this case to basically putting the thread through, like, three needles. And I don't think that Iqbal Twombly requires that. Did I answer your question, Your Honor? Yes. But I'm concerned about your time, which is now down. I have no time. So I guess that's it. If there's something that gets raised, can I come back up for a second? Maybe a minute. Yes. Thank you. Good morning. I please the Court. My name is Joel Siegel, and I represent the IHOP FLEs and their related entities. With me this morning is Karen Marciano, my colleague from my firm. Twelve years into an agreement, Mr. Hamid decided he didn't like the deal he signed. And what is before us today and what was before Judge Englund is an attempt to use the UCL to rewrite three agreements that were executed in 1998. In 2010, Mr. Hamid filed this lawsuit alleging that he could use the UCL to rewrite an equipment lease, which required him, on the day he signed it in 1998, to pay $740 a week for the receipt of a turnkey operation. This is not something for nothing. I'm sorry, what did you say at the last? This is not something for nothing. Mr. Hamid stepped into a fully operational turnkey restaurant in 1998 and could literally turn on the lights and start running a business for profit. Twelve years later, Mr. Hamid does not like that deal. And as part of that contract, he pays $700 a week? $740 a week for 25 years, the term of the agreement. That's the term of the agreement. Correct. Paying that $740 for what? Attached to the equipment lease in 12 line-item pages was a list of everything needed to run that equipment, to run that restaurant, vis-à-vis equipment, from ovens all the way from hard equipment ovens all the way down to plates, glasses, forks and knives. All of that is applied in the complaint. And if there's a problem with any of that equipment, he pays for it? That's correct. To fix it, to modify it or whatever, but then he still pays the $740 a week? That's correct. And is that fair? It is for what he agreed at that time. He received an entire turnkey restaurant, which was fully equipped and which he would have to maintain and repair and replace consistent with his franchise agreement as well. So at the end of the 25 years, that restaurant was still fully operational and it was returned to IHOP or an S&E. What's your best argument to distinguish the facts here from the Aria case? Absolutely. In Aria, the plaintiff complained that what Cannon had done violated his agreement. His agreement required Aria to pay for, I believe, monthly fee plus excess copies, copies he made. He argued that what Cannon was doing was slipping in to those, I believe, 17, there were 17 invoices, 17 instances. Cannon was slipping in up to 5,000 instances of where there were Cannon's copies. Cannon's people were coming in. They were running the machines. They were running test copies. They weren't copies that Aria was using or rather making out of his machine. So each time Cannon sent his people, their people in, and generated copies that were slipped into one of 17 instances of invoices, each one was a wrongful act. Each one violated his agreement, and that's the difference here. What Mr. Hamid is arguing here is that the deal he signed in 1998, he doesn't want anymore. This was simply invoicing, and there was no affirmative wrongful act, no new wrongful act, as Aria would require, to trigger the doctrine of continuing accrual. Well, okay. So what is we're talking about California law, where this is all California law, right? That's correct. Okay. So in California law, the case that would best, that we should look to, that best describes this situation, where the statute of limitations accrued at the beginning of the contract would be what? You know, Yurkovich, for example, is a great example. In Yurkovich, there was a contract involving the provision of production-related services with MCA, and the case went on for a long time. There were a lot of parties that came and went, a lot of additional parties. But 12 years, actually 13 years into, rather, 13 years after the original agreement, the claimant tried to amend the complaint, a third amendment complaint, and added a claim for unconscionability, and said, look, the agreement that I entered into 13 years ago, pretty close to the situation we are up here at, 13 years versus 12 years, that he should be able to allege the agreement he signed back in, I believe, it was 1989, was unconscionable. And, no, that's, you know, there he argued continuing violations. But, again, it's not applicable here. ARIA is a change in the law for sure in California. It does not change the result in this case. If we think the equipment lease claim is timely, because I think you make an alternative argument out there on failing to state a claim, could we affirm on the ground that it failed to state a claim? What's your best argument that it does not state a claim? Well, it doesn't state a claim because the UCL is not a tool to rewrite contracts. The contract that Mr. Hamid signed back in 1998 provided for the very payments that he now complains about. It is not, as Judge England noted, appropriate for a party to reap the benefits of a contract for 12 years, and when he decides it's no longer profitable for him or as beneficial it used to be, to then say, I want to rewrite the deal. There was no case that I believe was cited by a plaintiff to suggest that you could use the UCL to go back in time and change that deal. Was there a new master lease? Not even alleged. I mean, as conceded, it was the sale, and this is in the complaint and the First Amendment complaint, it was the sale of the property between a disinterested third party and another disinterested third party that caused the increase of property taxes under Prop 13, and at best, after multiple choices, I'm sorry, multiple chances to amend, the last of which was rejected, Hamid could never plead that there was an actual lease. Instead, he used quotations around there must have been a new lease. He assumes that, but he could never state that. And under the sublease, I appreciate the Court's focus on this, under the sublease, 2.2 clearly states, as is common in a triple net lease, that it's the subtenant who's responsible for taxes, all real and personal property taxes, including assessments. Well, I don't think you can go on that alone. You've got to read the whole contract. You have to read the whole contract, and then you get to the other provision. So I think it's a mistake for you to argue 2.2 is decisive. It's a whole contract. So we look at that other provision, and give us your interpretation of that. Understood. Understood. The clause the plaintiff focuses on is at the end of 9.1, which deals with subordination, and thank you. That clause, which begins, provided, however, that the lease, the new lease does not cause an increase in rent or, you know, an increase in material obligations, that under the Ninth Circuit case of Timms, that qualifies the preceding sentence or the preceding part of that sentence, I should say. And that deals with subordination. So 9.1, which deals with subordination, says the subtenant shall subordinate, provided, however, shall subordinate his interest to a new lease, provided, however, that that new lease does not result in an increase. So that deals with whether or not the subtenant has to subordinate. It does not address the obligation to pay all taxes, which is in 2.2. And so I agree the contract has to be read together, but that limiting language that provided, however, following the semicolon under the case of Timms would apply to the preceding part of that sentence. Okay. Let me ask you again about the unfairness of all of this. This went off on a 12b-6, right? That's correct. So we have to assume the truth of the allegations. If the amount of money that he was required to pay was, in fact, unfair and he was not getting what he should have gotten for it, is there not a continuing violation? The continuing violation doctrine has typically arisen in cases involving continuing pattern of small advance, for example, where small dollar amounts happened or it was a tort, for example, as plaintiff mentioned in his opening. So you'll see it in Title VII cases and 1983 cases and whatnot. It is. I'm aware of that, and I'm trying to apply it in the context of the California statute contemplates, which is pretty much tortious conduct. I think that Yurkovich would say no. I think that the harm, the complaint here is that the contract itself should be unenforceable or is somehow unconscionable. What happens after that are simply continuing effects of that contract. It's not a continuing violation. For example, I would argue in Jarvis, which is, I believe, a continuing violation case, each time the tax was imposed, because the government code talked about an imposition itself being the collection of tax, each one would be an event under the continuing effect of that contract. And I think that's what happened back in 1998. Yeah. Well, I'd like to speak a little bit about the issue of waiver. First, Mr. Hamid waived his unjust enrichment claim. He was given, after his first complaint, the express opportunity to amend, and he failed to include that cause of action, that claim in his first amended complaint. Second, Mr. Hamid has waived his claim to an accounting that came up earlier, and I just wanted to address that briefly as well. While he identified accounting as an issue for appeal, there was no briefing submitted for that. And on reply, there was an attempt to resurrect it with reference to, I believe, pages 23 of his brief. Yet accounting isn't discussed there or briefed either. And then third, of course, Mr. Hamid has waived his right to further amend the complaint given the chance to do so. Really, just after the first night complaint, he chose to do otherwise. And the district court's judgment should be affirmed. Thank you. Thank you. I have one minute. Thank you. So, if the $740 per week was as part of the consideration for the contract, it could have said so. It doesn't. It says it's for rent for the equipment. And this long list of equipment that was there when it was a turnkey operation, none of that's there anymore as of 2008. It's all been replaced. It's all turned over. And so $740 in rent, I don't know what the heck that's going to. If they had wanted to make some sort of kind of global term where they say, okay, so after all of the equipment has been turned over and it's now being bought by somebody else, they could have said that. They could have said the 740 goes for all sorts of things. They didn't say that. Thank you all. Is your theory that once it was paid for that it became fraudulent or unfair? Yeah. I mean, I think that there are lots of different labels we used in the complaint, and I could use here unconscionable. So the answer to that is yes, is that at some point in time when that equipment is no longer being leased, and I have no idea at this point in time what IHOP's intent was back in 1998, because I haven't had a chance to take any depositions or do any discovery. But did they believe at some point in time that they were going to continue to get $740 and not have the equipment? Gosh, that's an answer I'd like to know. Thank you all. Okay. Thank you. Thank you for your arguments here today. The case is now submitted.
judges: Schroeder, Noonan, Murguia